Filed 1/18/24  P. v. Tapia CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061786 |
| v. | (Super. Ct. No. 96CF0802) |
| MIGUEL ANGEL TAPIA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Scott A. Steiner, Judge.  Reversed and remanded.

Aurora Elizabeth Bewicke, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Alan Amann and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Defendant Miguel Angel Tapia appeals from an order denying his petition for resentencing made pursuant to Penal Code former section 1170.96 (now Pen. Code, § 1172.6).[1] Tapia and four codefendants—Juan Rivera, Carlos Diaz, Guadalupe Vertiz, and Jorge Castro—were convicted in 1998 of second degree murder for the stabbing death of Cesar Arroyo. The trial court denied Tapia's resentencing petition without issuing an order to show cause on the ground the record of conviction, including Tapia's testimony, established beyond dispute that Tapia was the actual killer. We conclude the trial court should have issued an order to show cause and conducted an evidentiary hearing and, therefore, reverse and remand for those purposes.

FACTS

I. *Attack and Killing of Arroyo*

On March 14, 1996, at around 9:20 a.m., K.L., her boyfriend Cesar Arroyo, and her sister L.L. were walking northbound on Standard Street in Santa Ana on their way to a grocery store. A brown-colored car approached them from the opposite direction, made a U-turn, and pulled up beside them. Rivera jumped out of the car and, with a beer can in his hand, asked Arroyo, "'Where you from?'" Arroyo responded, "'I don't claim." When Rivera asked him again, Arroyo insisted, "'Really I don't claim.'" Rivera proclaimed, "'We're from Lopers," or "'big, bad Lopers'" and threw the beer can at Arroyo. K.L. interceded, and the beer can hit her on the head.

Tapia, Diaz, Vertiz, and Castro then jumped out of the car and with Rivera, started beating Arroyo. Arroyo, who was five feet 5 inches tall and weighed 131 pounds, did not fight back. After a minute or two of being beaten, Arroyo fell to the ground against the fence. He tried to cover and protect himself while Tapia and his codefendants

_____

[1] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text (Stats. 2022, ch. 58, § 10). All statutory references are to the Penal Code.

2

continued to assault him. They continued to kick and hit Arroyo for five to six minutes as he lay on the ground.[2] Tapia and Vertiz punched K.L. when she tried to pull them off of Arroyo.

At some point, Tapia stepped away and stood behind L.L. A few seconds later, three of the defendants got back into the car while another stood at the back of the car and waited. Arroyo managed to stand up. One defendant, identified as wearing a blue shirt and dark, square pants, went up to Arroyo and pushed him in the chest. Arroyo started walking, then stumbled and fell to the ground.

The defendant who pushed Arroyo walked back to the car and got in. Once all five were inside, they drove away.

L.L. went to seek help, and police officers arrived shortly thereafter. Arroyo had been stabbed several times and later died from his wounds.

Police officers took K.L. and L.L. to a liquor store where the officers had pulled over a car matching the description of the car the defendants were in. Tapia and his four codefendants were inside the car. Both K.L. and L.L. identified Tapia as having participated in the attack on Arroyo.

II. *Arroyo's Autopsy*

Joseph Halka, a pathologist for the Orange County Sheriff-Coroner, performed an autopsy on Arroyo's body. Halka testified that Arroyo died from exsanguination (he bled to death) caused by a stab wound to the heart and left lung. Halka found a total of seven stab or slash wounds. The wound to the heart was caused by a knife with a "two-edged configuration," meaning it was sharp on both edges or sides. Before Arroyo died, emergency surgery had been performed that altered "some of the

---

[2] K.L. testified that while Arroyo was on the ground the defendants hit and kicked him. L.L. testified that four of the five defendants "piled on" Arroyo as he lay on the ground and one defendant stood behind her.

3

contours" of the wounds. The remaining knife wounds, including defensive slash and "punctate" wounds, were nonfatal and could have been caused by either a two-edged knife or a one-edged knife. Arroyo also had bruises and contusions on his body.

III. *Tapia's Police Interview and Trial Testimony*

Police investigators interviewed Tapia early on March 15, 1996. Tapia admitted that he and his fellow gang members had attacked Arroyo but repeatedly denied having used a weapon. Tapia told the investigators that, before the attack, "the other guys said, 'watch that guy,'" with reference to Arroyo. Diaz (the driver) stopped the car, everyone got out, and they started attacking Arroyo. When asked why Tapia attacked Arroyo, Tapia responded, "But was very — if you see him in the street like that, you're going to figure he's a gang member, and you're going to stop him, and you're going to say hey, you understand me?" Tapia claimed he did not have any weapons and did not stab Arroyo.

At trial, Tapia testified he was the one who stabbed Arroyo and he had lied to police when he was arrested. He testified he did have a knife in his pants' pocket and had obtained the knife from work at a Del Taco, where he use it to cut up boxes.[3] The knife was "straight" (as opposed to being a folding knife), had a three-inch blade and a three-inch handle, and was sharp on both edges. He did not have a sheath or pouch for the knife but on March 14, 1996, he was wearing oversized pants with huge pockets that could accommodate the knife. Tapia testified he had forgotten about the knife when he left work at 4:00 p.m.

---

[3] Payroll records for the Del Taco showed that Tapia had last worked there on February 15, 1995. Tapia's father, who was the manager of the Del Taco, testified that knives that were sharp on both edges were used at that Del Taco and that he had not seen such a knife at the store in March 1996.

Tapia testified that he and his codefendants did not have any discussion about getting into a fight. Tapia had been drinking earlier that night and was drunk. Tapia claimed that as the five drove past Arroyo he screamed, "Little Minnie Locotes" and lifted his hand with five fingers outstretched at a 45-degree angle. The car made a U-turn and all five passengers got out of the car and attacked Arroyo. Tapia took out the knife and stabbed Arroyo. Tapia remembered stabbing Arroyo a few times. Tapia did not remember how it happened because he was drunk and did not recall why he stabbed Arroyo. When he realized he was stabbing Arroyo with a knife, Tapia got scared and ran back to the car. He did not think he had seriously injured Arroyo because Arroyo was still standing and walking.

Tapia and his codefendants got back into the car and drove off. Later they returned to the place where they had attacked Arroyo and saw an ambulance. They then drove to a liquor store to buy more beer. Soon thereafter, they were stopped by police officers and arrested.

At first, Tapia claimed that he could not remember what he did with the knife. But he then testified that he had tossed the knife out of the driver's side window while on the way to the liquor store. Tapia claimed none of his codefendants knew he had a knife, that he had stabbed Arroyo, or that he had tossed the knife out the window.

PROCEDURAL HISTORY

I. *The Jury Trial Leading to Tapia's Conviction for Second Degree Murder*

Tapia and the four other defendants were charged by amended information filed in 1997, with the murder of Arroyo. It was alleged the murder was committed for the benefit of, at the direction of and in association with a criminal street gang. (§ 186.22, subd. (b)(1).)

In May 1998 Tapia and his codefendants were tried together by jury. Outside the jury's presence all defendants admitted that they were members of the

Lopers, that the Lopers was a criminal street gang, and any alleged crimes they were convicted of committing had been committed for the benefit of the Lopers.

The jury was instructed on aiding and abetting, conspiracy, murder, express and implied malice, attempted murder, second degree murder resulting from an unlawful act dangerous to life, and the lesser included offenses of assault with a deadly weapon, simple battery, and simple assault.

The jury convicted all defendants of second degree murder. The jury found that Tapia had personally used a knife at the time of the commission of the murder.

The trial court sentenced Tapia to a term of 28 years to life in prison, which included a principal term of 15 years to life for murder, four years for enhancements, and nine years for other offenses not relevant here.

Tapia and the other defendants appealed. In an unpublished opinion, a panel of this court remanded for reconsideration of presentence custody credits award but otherwise affirmed the judgment and sentence. (*People v. Diaz et al.* (Mar. 28, 2001, G023892).)

II. *Tapia's Petition for Resentencing*

In April 2022, Tapia filed a petition for resentencing under section 1172.6. In a written response, the prosecution argued the petition should be denied at the prima facie stage because the record of conviction, based on the jury's true finding that Tapia personally used a deadly weapon, established he was the actual killer.

Tapia, for whom counsel had been appointed, filed a brief in support of resentencing and argued that an order to show cause should be issued based on his allegations that he was eligible for relief. Tapia argued the jury's true finding that he personally used a knife in the murder did not necessarily mean the jury had found he was the actual killer because it could have found that he displayed the knife or struck the victim with its butt end.

6

The trial court denied Tapia's resentencing petition at a hearing held on September 8, 2022. Tapia filed a notice of appeal on the same day. About one month later the trial court issued a statement of decision. The court found: "The record of conviction, including Petitioner's own testimony before the jury in this case conclusively shows that petitioner was the actual killer. [¶] As the actual killer, petitioner would be guilty of murder under the current law and is ineligible for resentencing under Section 1172.6."

PROCEDURE AND STANDARDS UNDER SECTION 1172.6

By legislation effective January 1, 2019, the Legislature amended the felony-murder rule and eliminated the natural and probable consequences doctrine of liability as a basis for a murder conviction. (Stats, 2018, ch. 1015, § 2; see *People v. Reyes* (2023) 14 Cal.5th 981, 984.) The latter result was accomplished by amending section 188 to provide that, except in cases of felony murder, "in order to be convicted of murder, a principal in a crime shall act with malice aforethought." (§ 188, subd. (a)(3).)

To obtain relief under section 1172.6, a petitioner must file in the sentencing court a petition alleging these three conditions have been met: (1) the petitioner was convicted based on a pleading "that allowed the prosecution to proceed under a theory of felony murder, murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" (§ 1172.6, subd. (a)(1)); (2) the petitioner was convicted of murder or attempted murder (*id.*, subd. (a)(2)); and (3) the petitioner could not now be convicted of murder or attempted murder as those offenses are presently defined (*id.*, subd. (a)(3)).

If the petition satisfies certain technical requirements, then the trial court appoints counsel if the petitioner has requested counsel. (§ 1176.2, subd. (b)(3).) Next, "the prosecutor shall file and serve a response," and "[t]he petitioner may file and serve a

reply within 30 days after the prosecutor's response is served." (*Id*., subd. (c).) Once briefing is completed, the trial court determines whether the petitioner has made a prima facie case for relief. (*Ibid*.) If the court finds the petitioner has made a prima facie case, then the court must issue an order to show cause. (*Ibid*.)

In determining whether the petitioner has made a prima facie case for relief under section 1172.6, the trial court's inquiry is limited: The court, accepting the petition's factual allegations as true, makes a ""'preliminary assessment""" whether the petitioner would be entitled to relief if those allegations were proven. (*People v. Lewis* (2021) 11 Cal.5th 952, 971 (*Lewis*).) ""'If so, the court must issue an order to show cause."'" (*Ibid*.) Within 60 days of issuance of the order to show cause, the trial court must hold a hearing to determine whether the petitioner is entitled to relief. (§1172.6, subd. (d)(1).)

If counsel is appointed and the parties are given the opportunity for briefing, the trial court may rely on the record of conviction to determine whether the petitioner has made a prima facie case for relief under section 1172.6. (*Lewis, supra*, 11 Cal.5th at p. 957.) "The record of conviction may include the underlying facts as presented in an appellate opinion, the trial evidence, the jury instructions, and closing arguments of counsel." (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13.) "The record of conviction will necessarily inform the trial court's prima facie inquiry under section [1172.6], allowing the court to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis,* at p. 971.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under subdivision (c) [of section 1172.6]." (*Id*. at p. 972.)

"In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.'" (*Lewis, supra*, 11 Cal.5th at p. 972.) "While the

trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section [1172.6] relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, "'the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause.'" [Citations.] '[A] court should not reject the petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing.' [Citations.] 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner."'" (*Id*. at p. 971.)

## DISCUSSION

I. *Standard of Review and Standard for Denying Relief Under Section 1172.6*

The trial court denied defendant's resentencing petition on the ground defendant had failed to make a prima facie case for resentencing relief. Denial of a resentencing petition at the prima facie stage is warranted only if the record of conviction demonstrates the petitioner is ineligible for relief as a matter of law. (*People v. Lopez, supra*, 78 Cal.App.5th at p. 14.) That is a purely legal conclusion subject de novo review. (*Ibid*.)

"A petitioner is ineligible for resentencing as a matter of law if the record of conviction conclusively establishes, with no factfinding, weighing of evidence, or credibility determinations, that (1) the petitioner was the actual killer, or (2) the petitioner was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree, (3) the petitioner was a major participant in the underlying felony and acted with reckless indifference to human life, or (4) the petitioner acted with

9

malice aforethought that was not imputed based solely on participation in a crime."
(*People v. Lopez*, *supra*, 78 Cal.App.5th at p. 14.)

II. *Tapia Is Entitled to an Evidentiary Hearing*

Tapia argues he was entitled to an evidentiary hearing on his resentencing petition because the record of conviction does not conclusively establish as a matter of law that he is ineligible for relief. Although Tapia testified he had stabbed Arroyo, Tapia argues that one or more of the jurors might have disbelieved that testimony, as well as his testimony that he was not threatened by any codefendant, and found him liable under a now impermissible theory, in particular, the natural and probable consequences doctrine. Tapia contends the trial court engaged in factfinding by finding that he was the actual killer.

We agree that the record of conviction does not conclusively establish that Tapia is ineligible for relief. The jurors, who were instructed that they were "the sole judges of the believability of a witness," might have disbelieved Tapia's testimony. The prosecutor left open the possibility that Tapia was not the stabber. In closing, the prosecutor argued, "[I]f you believe, as jurors, that one of the defendants was the stabber, which the evidence obviously shows, in fact, Mr. Tapia admitted being the stabber, but as you will see when I go through the law dealing with group liability, which is the uncharged conspiracy or aiding and abetting, either of those theories, that the law holds all five defendants accountable even though only one of those defendants may be the stabber. The prosecutor also told the jury, "Whoever the stabber was, whether you believe it was Mr. Tapia, as he said, *or it's one of the other defendants*, that person clearly acted with the express intent to kill." (Italics added.)

The jury's true finding on the knife-use enhancement does not conclusively establish that Tapia was the stabber. The jury was instructed on personal use of a deadly or dangerous weapon and in that instruction was told "the term 'personally used a deadly

or dangerous weapon,' as used in this instruction, means the defendant must have intentionally displayed a weapon in a menacing manner or intentionally fired it or intentionally struck or hit a human being with it." That instruction did not require the jury to find that Tapia stabbed Arroyo and killed him in order to return a true finding. Indeed, the verdict returned by the jury did not even find that Tapia had used a knife in the commission of the murder: The verdict on the dangerous weapon enhancement states only that the jury found that Tapia "personally used a deadly or dangerous weapon, to-wit: KNIFE, *at the time of the commission of the offense* alleged in COUNT 1 [murder]." (Italics added.) The jury might have found that Tapia brandished the knife, delivered the nonfatal stabs, or used the knife for a purpose unrelated to the murder at the time the offense was committed.

At trial, the prosecutor argued strenuously that all defendants were guilty of murder under the natural and probable consequences doctrine. Without factfinding, the record does not foreclose the possibility that Tapia was convicted under that doctrine.

Given the record of conviction, and Tapia's testimony in particular, it might seem unlikely that the jury found anybody other than Tapia to be the actual killer. Tapia's trial testimony, if believed, would be substantial evidence that Tapia was in fact the actual killer. But such a credibility determination would be inappropriate at the prima facie stage because the record does not positively refute the allegations of Tapia's resentencing petition. (*Lewis, supra*, 11 Cal.5th at p. 971.) At the prima facie stage, the standard is that the record of conviction must conclusively establish that Tapia is ineligible for relief as a matter of law. We cannot say it does. An evidentiary hearing is therefore in order.

Our opinion should not be read as indicating whether the trial court should grant or deny Tapia resentencing relief. Exercising de novo review, we conclude only that Tapia has met his burden of making a prima facie case for relief under section 1172.6, subdivision (c).

11

## DISPOSITION

The postjudgment order is reversed and the matter is remanded with directions to the trial court to issue an order to show cause and conduct an evidentiary hearing.

SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOORE, J.